Good morning, Your Honors. I'm Fred Gerkens from Glancing Binko Goldberg, Co-Lead Counsel for Plaintiffs in the Securities Fraud Class Action. This case is a fairly simple one. It concerns defendants' failure to disclose material facts tending to seriously undermine their positive statements concerning Salesforce productivity and turnover. At the beginning of the class period, which was January 31, 2007, the defendants had made at least three or four positive statements about the Salesforce expansion and its relation to revenue growth. And I will quote a couple if I may here. We believe the strong revenue growth and improved leverage in our operating model were primarily attributable to investments in our Salesforce. A number of factors contributed to the strong fourth quarter and full year results, including the continued strength of our investments made in Salesforce expansion. And during the past year, we expanded our Salesforce in North America and now have one of the largest domestic sales teams in the light-based aesthetic market. We're continuing to see increased productivity from this expansion. Now, these types of statements were always made in 10-Qs, in prefatory statements to their conference calls, and in the 10-Ks. And only upon inquiry by an analyst would defendants ever hint or allude to, and allude is the word that the district court used below, allude to any kind of problems with the Salesforce expansion. And let me give you an example of that. At January 31, we had an analyst asking about turnover, productivity, and headcount. And in response to that question, defendant Connors stated, we now have, we are not seeing the productivity we anticipated in this particular group, so we have since made, or this particular recent Salesforce employees, recent hires, referring to approximately about half of the Salesforce expansion program. Counsel, let's be specific. What he said was the senior portion of the Salesforce showed modest improvements. Now, there was a senior portion, which I think was called the ASMs, and there was the junior portion, which was the, I think, ASAs. That's correct. It was the ASA program that ultimately was terminated. Well, the, yes, in regard to the last point, yes, Your Honor, the defendants. But the point I want to make is that in the January 31 conference call, isn't the reference to the senior portion or the ASMs? Well, I think it's ambiguous. I mean, the defendants are drawing this bright line between, and I think some of this probably did resonate with the market, as you can see from the November 6 conference call. But at January 31, they were still talking about the more recent people that were hired in March. They had two hiring sprees, apparently, one in 2005, the last quarter, and then in the first quarter, they ramped up to another eight that they hired in March. So they were referring to a portion of the ASAs, and I think that's what the market was looking at, if you looked at the questions that the defendants were asking. And I think what they, regardless, all the defendants came back with is we made, you know, we made modifications to the alignment of the sales force and anticipate increased productivity from the sales force organization as a whole. But you've said that, in your view even, it's ambiguous as to whether they're referring to the senior force when they're making some of those statements, correct? And then you have the other analyst call, and then you talk about losing various, you know, various employees are lost and all. Is there anything to pinpoint the timing of that? Yes. We have, we had confidential witnesses and the defendants' own statements. Defendants stated at May 7th that the, there was 18 new persons in sales positions, in new positions, that had been hired. And they were in sales positions as of March 31st for the last six months. In other words, six people, 18 new people in sales positions as of March 31st for the last six months. That now places the turnover and the reorganization, they ultimately call it a reorganization, in the fourth quarter of 2006. We also have two confident... Excuse me? I mean, that's what I'm having some trouble understanding is how you pinpoint that to... To the fourth quarter? I mean, yes. Because the defendants stated, let's see here, I'll quote it. I have it here. Yeah. We have 18 sales persons were in new positions for less than six months as of March 31st, 2007, requiring nine months to ramp up sales. Now, as of March 31st, 18 people, that puts, he didn't say three months. Okay? He said, and this was in response to a question from an analyst who said, how many people left in the last six months as of March? I count 20. That's what the analyst said. Okay. And he comes back with, well, this statement was made earlier, and then he comes back with, in response to that question, how many people left in the first quarter, and never answers the question about how many people left in the fourth quarter. And then we have two other sales people saying that they split the territories in 2006. You got me totally confused now, because I'm trying to really pinpoint from January 31, what they said, May 7, make the numbers, and here's my problem, is I can't get a date on the numbers. That's what I'm having, and now you are trying to do that, but I have to admit, I'm still confused. Well, if I may, Your Honor, I know you're saying, well, it has to be this, because it has to be that, but I'm just trying to say, if you look backward after the May 7 conference, and he says 20 employees, and then they go in and they talk about 10 senior sales reps, 11 new ones, transfer these guys, what do I look to in the allegations to pinpoint the timing? The confidential witnesses, Your Honor, and also his statement itself. I mean, I think his statement is clear that we have, we've got 18 persons in sales positions as of the last six months, as of March 31, 2007. He didn't say the last three months. He didn't say the first quarter. He's a third of the way into the quarter, and he's telling us that we had, we hit a little bump in the road, and that's exactly what the district court stated. It looks like we fixed it, and then he asked the defense counsel below what happened. So that was the impression, and, Your Honor, if I may, you know, this is just common sense, too, at this point. The defendants have argued, and the court also held, found that turnover was disclosed January 31st, which it was not. He also found, the defendants have now came up with a new argument in their appellee's brief that communicated to the market was that the sales organization was in flux, okay? And the third one was, is that productivity, all the problems with the sales force were disclosed January 31st. He found that. He made a factual finding of these things. Now, the analyst's take on this was not that. The analysts, we pled analyst reports, the analysts upped their estimates, and they stated because of the superior execution, two of them said because of the superior execution of Qutira's sales force. And I submit, Your Honor, if these items were disclosed, if it was disclosed that there was massive turnover, if it was disclosed that the organization was in a state of flux and that the junior sales program had failed, they never used the term failure until the end of the class period, and just the court found, or the defendants argued that, I submit that the stock price would not have gone up by $6 or 23 percent in January 31st. I mean, this is just common sense under Telabs, under South Ferry, et cetera. And we also have to look collectively at the facts here. If they had fully disclosed these facts, and actually, let me just back up a second here. I mean, this is another situation that's similar to Boeing, if I may, and in that case, I think the severity of the production problems in Boeing were much more, much better communicated to the market in that case than in this case. And when the first partial disclosure came out on April 5th, 2007, it wasn't just talking about missed earnings. It was talking about the fact that the production, the problems with the sales force were much worse than originally talked about on January 31st, and they were still looking to fix it. This is on April 5th. On April 30th, they try to rehabilitate the stock price. They come out. Defendant Connors comes out with a shareholder's letter and states that, you know, states other things that are very, very positive about the sales force expansion, and it's incredible that he would still state these things after being sued, and says, by the end of 2006, we had developed one of the largest North American sales organizations in our industry, enabling us to increase annual revenues by 29%. That was true, wasn't it? Wasn't that true by the end of that quarter? Well, he's attributing that to you. Why was it true? Because he's attributing what we had pled, Your Honor, was that only a few people, and the analysts picked this up, only a few of the senior sales people were producing this, and they were touting this junior sales force expansion, this whole sales force expansion, and they linked that directly to the growth in revenues throughout, and also before the class period. If one guy sold all of that, we have a huge sales force, and one guy was managing to do 100% of his blockbuster sales, it would still be true, right? What's false about it? Well, no, they didn't attribute it to one individual. They attributed yes, I think that's a half-truth, Your Honor. Of course, it's more than just a half-truth. I mean, I think that if you attribute it to one person, and then, you know, then that would have been full disclosure. The problem is they attribute it throughout to the increased expansion of the sales force, the junior people. And the people that they were hiring, they were not attributing it to the senior  So it's a half-truth. So is this a statement, again, that you think is either a half-truth or a failure to disclose? We have since made modifications to the alignment of the sales force. Is that true? And increased, and expect increased. Well, no, I think this is going back to the fact that I think at that point we have evidence that they had discontinued the junior sales force altogether. They were constantly being asked questions about the junior sales force. And if I may, Your Honor, I would like time for rebuttal. Thank you. All right. Good morning, Your Honors. Paul Clement for Kutera. Your Honors, there's a perfectly straightforward explanation for the observed fluctuations in Kutera's stock price during the class period. Kutera first made an optimistic revenue projection on January 31st, and the stock went up. It then disclosed that the revenue projection was not going to be met and that earnings were worse than expected on April 5th, and the stock went down. Then on May 7th, it confirmed that the results were suboptimal and then also gave a sobering projection for the second quarter. And all of that perfectly explains the fact that Kutera's price went first up and then went down and then went down some more. Now, the plaintiffs in this case have studiously avoided trying to bring a securities action based on those statements about the failed earnings projection for the simple reason that they don't want to fall into the safe harbor and the PSLRA. But what they're left with is a series of allegations that are simply implausible, that fail to make any heads or tails out of the fluctuation of Kutera's stock price, and Judge Walker correctly dismissed those claims. And if I could try to get you to focus on one way of understanding the fatal flaw in these allegations that are focused on varying degrees of sort of shadings of the truth or shadings of meaning with respect to the disappointment with the junior sales force, I think the best way to show up the fatal flaw is to compare what was said in January 31st with what was said on April 5th. So let's put May 7th to the side for a second. If you look at those two statements, they are virtually indistinguishable. On January 31st, Kutera explained in response to an analyst question with respect to the junior sales force, quote, we didn't get the productivity we were looking for with that. In the wake of that disclosure, the stock went up 17%. Then on April 5th, in a press release, Kutera explained that its lower results were in part because of, quote, lower than expected productivity from its recent sales expansion to wit the junior sales force. Now, in the wake of that virtually identical disclosure, the stock goes down 30%. Now, a theory that ascribes falsity and materiality to these two disclosures that then are essentially materially indistinguishable but drive the market in diametrically opposite directions faces a serious hurdle, I think, with respect to its plausibility. Well, let's back up to the January 15th through 19th sales conference in Laguna Beach, where Mr. Connors takes the ASAs aside and explains that the company is not going to invest any more in that ASA program and that they could all transfer to a different position or leave the company. In other words, they're going to do away with ASA program, the junior sales program. It's not until May 7th when the company says that, well, the earnings were a problem and it was the aberrant change in the sales force and this, quote, significant turnover. Now, that was never disclosed before May 7th, was it? Well, I mean, it was not a significant change. I mean, the company's own words were a significant turnover, aberrant type of change. That ASA sales force was disbanded by mid-January, was it not? I believe it was, Your Honor, but I think it's important. Was that ever disclosed? Well, I think it was disclosed on January 31st. What does it say on January 31st that discloses that? It says we didn't get the productivity we were looking for with that. There's then a reference to the senior sales force being more productive, and then they say we've modified the alignment of our sales force. Now, in fairness, I suppose that could be more forthcoming, and there's a difference between that disclosure in January and the disclosure in May 7th, which puts some more flesh on those bones and says the program was discontinued. But I think that's essentially the same disclosure. They've said, using the past tense, we did not get the productivity we were looking for with that program. It then goes on to say, but the sales, the senior sales program is doing just fine, and then says we're going to modify the alignment, by which they mean basically people in the junior sales force will be given the option of taking a senior sales force position or they're going to have to leave the company. And I do think also it's worth ---- Let me just step back on this. Of course, there's this argument about whether taken together, various of these things are forward-looking or, as the appellants say, that really, you know, these are separate statements that are made or, in their view, actually omissions. So it's just a standard securities failure to disclose and omitting material information. How do you analyze the January 31 statement on their theory that they really ---- you failed to omit the essential information? Well, I mean, I guess I'd want to know a little bit more about what they think is the essential information because I think ---- Well, I think he says the essential information is that basically you'd ask the junior sales force. I mean, that's in rough terms. Right. And I guess what I would say to that is, I mean, there is a disclosure that we didn't get the results, the productivity we were expecting from the junior sales force, and that we, therefore, have modified the alignment of our sales force. So I think that there's part of the disclosure. Let me say one other thing. Just I think it's important to recognize that all of this, of course, on January 31, is coming on the heels of a fourth quarter that exceeded expectations, that was a very robust fourth quarter, and yet it's clear that the junior sales force did not contribute to that robust fourth quarter, and nobody's made a claim that they did. Consistently, Kutera has explained that they haven't gotten the junior sales force kind of up and running. So I think it's a bit of a mistake to think that, you know, the discontinuation of this program that wasn't contributing to the bottom line is really what's, you know, driving the market or anything else. I also think it's important to recognize that to the extent there's any discussion of turnover at the January 31 conference, it is discussion about the turnover in the fourth quarter. And the answer there is that the turnover in the fourth quarter was nothing unusual, not aberrant. And there's no reason to think that anything has happened in the fourth quarter. And before I sit down, I'd like to talk about that 18 number from May 7th. But let me try to be, I feel I maybe haven't been fully responsive to your question, which is I do think at the end of the day, the right way to look at this case is that the relevant statements were forward-looking statements. And throughout this case, again, I think the plaintiffs have tried to walk this fine line where they don't want to rest their case on the earnings projection, because everybody understands that's the prototypical forward-looking statement that would trigger the safe harbor. So they've tried to essentially say, well, you made some misstatements about the details of the junior sales force and some other things, and that made the way they really sort of structured the complaint is then that makes your earnings projection itself misleading somehow. It seems to me the way they've structured this, they still make this at bottom a forward-looking statement. And in that sense, I think actually ---- I guess that to me is a starting point legal question that we'll have to figure out, and that is does all of this fall under the umbrella of forward-looking, or is there kind of a carve-out, as they've suggested? Are there any cases that have dealt with that issue as to what is the scope of forward-looking? There are, Your Honor, the two cases. They're both out of circuit. But the two cases that I would point you in the direction of is the Eleventh Circuit case, Harris v. Ivax, and then there's the Sixth Circuit case called Miller v. Champion. And both of those cases deal with what you might call mixed ---- what those courts referred to as mixed statements. The Eleventh Circuit case is what again? Harris v. Ivax, I-V-A-X. And let me also say that I think actually the statute is quite helpful on this question because there's a statutory definition in the safe harbor provision, and there's two things in that definition, I think, that suggest that the statutory safe harbor essentially is inclusive rather than exclusive in terms of taking these kind of mixed statements. I think the statutory definition has two indications that those mixed statements come within the safe harbor. The first is just ---- and this is 15 U.S.C. 78U5, and then it's in ---- the definitions are in subsection E. And they start out with the very first term defined is forward-looking statement. The first subsection of that definition says that a statement containing a projection of revenues, income, earnings per share, capital expenditures, or other financial items. So it's a pretty broad definition because it doesn't just focus on the earnings projection. It says a statement containing a projection. And then if that weren't, I think, a strong enough indication that a forward-looking statement is intended to be relatively broad, if you look at subsection D of the same definition, it then says any statement of the assumptions underlying or relating to any statement described in subparagraph A, B, or C. So ---- Well, let me ---- I'm still back on the January 31st conference call. And I know that the press release dealt with the previous quarter, and I know that the question asked dealt with the previous quarter. But then Mr. Connors states the senior portion of the sales force showed modest improvements in sale productivity. I assume that's referring to the fourth quarter. But then he goes on to say, so we have since made modifications to the alignment of the sales organization. Now, that's not forward-looking. That's, as I read it, since the fourth quarter, we've made modifications to the alignment of the sales organization. We now know that, in fact, in mid-January, they've just eliminated the ASA program, don't we? Well, sure, but ---- Isn't that kind of misleading at best? We've made modifications. It's certainly not forward-looking. You would agree with that. I'd say that statement in isolation I would concede is not forward-looking. Well, was it truthful? I think it was. I mean, you know, you have a company that has a senior sales force that seems to be doing quite well and a junior sales force that's underperforming, and they point that out in exactly, I think, you know, those are the way those two statements work together at the conference call. We didn't get the productivity we were expecting out of the junior sales force. We looked at the senior sales force, and that's still going well. So we've modified the alignment of our sales force, by which he means we've essentially discontinued the up or out. You either become a senior sales force in ASM or you leave the company. And, I mean, with respect, I think that there's nothing inaccurate about that statement. It surely could have been more detailed, but there's nothing inaccurate. And, again, I think if you put it in context, I mean, you know, that statement's not only not inaccurate, but it's also essentially what you would want the company to do when it just had a quarter where it was doing great with the senior sales force and wasn't getting contribution from the junior sales force. Now, one last thing about your question, Judge McKeown, is simply that, I think, whether you look at this at the end of the day as a case where they've managed to stay out of the safe harbor or they're in the safe harbor, the result is the same. They don't even pretend that they can sort of get out of the safe harbor. Judge Walker gave them an opportunity to replete their claim and focus on the cautionary statements, and they declined. The problem is if they're not in the safe harbor, then they're only in the safe harbor if they focus their case exclusively on these constituent statements of fact. And that's where they really fall down on simple plausibility that there was a false statement that drove the market and the share price. Because, again, these bare statements about modifying the alignment of the sales force, not getting the productivity that we expected versus discontinuing the program, those had no effect on the stock price. And we know that by looking at what happened between January 31st and April 5th. The same essential disclosure. We didn't get the productivity we were looking for in the sales force. In one, the stock jumps up. In the other, the stock jumps down. There's no plausible explanation based on just these narrow, backward-looking statements. There's a perfectly plausible explanation lying around in plain sight, which is the market likes it when you make an earnings projection that the next quarter is going to go like gangbusters, and the market doesn't like it when they're told that things didn't work out as planned. But this isn't a situation where they focus their case on that. If before I could sit down, I could get to those. The rest of May 7 numbers, and my question is, by the time those numbers come out, is there anything in the pleadings, then, that tags those numbers to what happened before the end of the first quarter? And let me take you right to that point, Your Honor. I think the answer is no. I mean, the only thing in the pleadings, I guess to give them, you know, the benefit of the doubt, is there is this statement made on May 7 that as of March 31, we had 18 people in their positions for six months or less, essentially, is the statement. Now, because he said six months instead of nine months, it leaves open the possibility that some of those new people started in the fourth quarter. But I really think, I mean, even under Rule 8, let alone Rule 9, let alone the PSLRA, that's too weak a hook to hang a case on. And then it's even worse than that, because if you look at the conference as a whole, which I think it's fair to do, you know, under the PLSRA and certainly in light of Iqbal, if you look at it as a whole, I think it becomes clear that the 18 people that Mr. Connors is referring to are all people that took their position in this quarter. And the reason I say that is because this is at the excerpt of the record, 652, if you want to look at it. The first quarter? What's that? Are you talking about in the first quarter? Yeah. He's very specific. He talks. The thing about his May 7 statement you say actually refers to the first quarter? Yes. If you look at 652, and then I think it also carries on to 653, he makes very clear that the 10 new salespeople, senior salespeople, and the eight people that have moved from the junior salesforce to the senior salesforce all did it, quote, in this quarter, where he's clearly referring to the first quarter. And I think that 10 plus that 8 gets you the 18 that he's talking about. The only other thing in their entire complaint that I see that gives any suggestion there was some undue turnover in the fourth quarter is a statement by an analyst that I get 20 on turnover, and I don't think that an analyst statement is really that relevant. The last thing I would say is as to any suggestion there was undue turnover in the fourth quarter, there's where I think the plaintiff's own confidential witnesses really undermine their case, because they have six confidential witnesses. Together, the six of them identify only one person who left during the fourth quarter, and that seems to me to be perfectly consistent with what was said in the January 31st conference call about the fourth quarter, which is turnover was normal, not aberrant, not unusual. If there are no further questions, Mr. Smith. Thank you. Your Honors, we do cite in our briefs cases discussing the scope of the PSRA, and if there's others, and that was Boeing Music Maker, America West, as a matter of fact, and UT Starcom. Now, I think in terms of the confidential witnesses, several of the confidential witnesses were, I mean, we put their termination dates. America West, are you relying on the footnote in America West?  They mentioned something else about how the miss in the earnings was attributable to the increase in costs and so forth. Your Honor, I would just like to spend a minute on, and this is related to the full – whether they disclosed the full extent and nature of the so-called modification to the alignment back in January. And I think what we have here is very telling, and that is the insider selling. I mean, immediately after January 31st, all five executives, this was a very small company, less than 200 people altogether, 55-person sales force, and all five of the executives, the only executives, one of which was the brother of Defendant Connors, was Vice President of North American Sales, sold, where they had not sold in the previous comparative period, and they had sold at very high prices, the class period high. And we also pled core business transactions. This was a core business. They spoke about the – When you said they hadn't – Excuse me? When you said they hadn't sold in other periods, are you talking about when there were permissible periods for sale? Yes. The prior – I'm sorry, the prior comparative period, yes. And then in the – we also mentioned the core business transactions. We had argued that below because this company was so small, and we had confidential witnesses talking about the reports that would go, the sales reports and so forth. The defendant – the court itself stated that problems were alluded to in January 31st and then jumps to the conclusion that they were fully disclosed. Now, alluded to in several circuits, including this one, and most recently we cite this in our case, Creek v. Wells Fargo, allusions to problems that are not fully disclosed. The inference should go in favor of plaintiffs, not defendants. Plaintiffs should get the inference of scienter here, and they also should get the inference of falsity here, that they alluded to these problems, but they're not fully disclosed. And the analysts, when they evaluated the disclosures on April 5th and May 7th, they were questioning – they constantly questioned what is going on with the sales force and how are you fixing this. And so that's something I think is certainly material, and they brought that up. We have admissions at the end of the class period. We did submit the 10-Q as judicially noticed. They do directly link the stock price to the failure of the junior sales force program. And so we had those admissions at the end. I think it was more than just fulsome disclosures at the end of the class period. I think it was the full truth. Thank you. Thank you very much, Your Honor. This is a privilege to be here before this panel. Thank you, counsel, for your arguments and also for the briefing, which has been very helpful. The Qatar Securities Litigation Appeal is now submitted. We have national lending, which is fully submitted on the briefs. And we're adjourned for the morning.
judges: Zilly, Thompson, McKeown